We will hear argument next in case number 24960, United States v. Alisigwe. We are just going to wait for everybody to get out of the room. Okay. Ms. Cassidy. Good morning. Good morning. I'm going to be talking about the effect of self-assertion. Now, it's important to note that the outset that Riley applied to general rules. He stated, we generally, I like that, determine whether to exempt a given type of person from the foreign requirement by assessing on one hand the degree to which an intrusion on an individual's rights, and on the other, the degree to which it is needed for the promotion of legitimate government. Right. And so Riley is depending on what the interest is there, right? And they say the search incident to arrest exception is about safety, and it doesn't seem like it's really related to officer safety to do a search of the cell phone. But that doesn't, I mean, just as a factual matter, that doesn't necessarily apply to the border. And then just as a kind of substantive matter, it doesn't seem to apply to the border, right? You can have evidence of criminality or inadmissibility on a cell phone such that the person shouldn't enter the country, or evidence of, you know, what people are calling digital contraband, like this is three numbers here, right? Well, Your Honor, first of all, the question here is about contraband. Contraband is a way in preventing someone from entering the country. If a contraband is being shown, you know, by a person, they can't have the border. But... I don't understand. I mean, first of all, I'm not sure that you need to show contraband, but why can't you have contraband? Like, so there are cases, you know, I don't know if it's from our circuit, but certainly other circuits, that, you know, if you're coming into the country with child pornography that's regarded as contraband, that stuff that we don't want to come into the country, certainly... And I don't know if it's even contraband, but certainly here he's using the information to create fake passports, which certainly is related to control of the border as to whether you're going to generate fake identifications to sneak into the country, right? Well, Your Honor, I'm concerned that it really doesn't have any bearing on the control of the border. So here there's nothing that can be on a cell phone that has any bearing on the control of the border? Is that your position? Well, that can be a concern. My position is that after Riley, it can't be, could anything on the cell phone that we would like to see in order to pursue criminal charges, that can't be considered after Riley because Riley holds that cell phones are in a different category of search, that they require a much more complicated... Well, they're saying it doesn't fall into the search incident or arrest exception, right? Well, they say more than that. What Riley changes is that it accepts the traditional search and detention standards, but what it changes is the standard for analyzing cell phone searches. But hasn't the Supreme Court and decisions of this court already set effectively the outer limit for searches at the border? And by the outer limit I mean body intrusive searches, right? So there, body intrusive searches only require reasonable suspicion. So that effectively what you're asking is that somehow a search of the phone, whether it be manual or forensic, is somehow more intrusive than a body cavity search, which would only require reasonable suspicion unless you're saying that somehow that is no longer good law after Riley. No, no, no. What I'm saying is that a cell phone search is differently intrusive. It is extremely intrusive, is what the court held in Riley. The cell phone search is not the same as a body search. It's obviously different from that. But it is as intrusive as the search of someone's home. That's what the court held in Riley. And so in order to, now in order to judge, but just before Riley also, cell phone searches were thought to be exceptions for Riley. Exceptions for the body. Well, can I just ask you about the intrusiveness question, right? So in Oberaha, right, we said that you could do a body cavity search that revealed drugs concealed in the suspect's vagina. And that required only reasonable suspicion. You're saying that looking at somebody's camera roll on their cell phone is more intrusive than looking into somebody's genitals? I'm not saying it's more intrusive. I'm saying it's very, very intrusive in a different way. But those are two very different things. The justification for those things. But it's a balance between a justification for it and an intrusiveness. And so with the body cavity searches, those are only done with a strong suspicion, reasonable suspicion of smuggling. Right, so you're saying that there should be a warrant for the cell phone, though. So if there's reasonable suspicion that there's something on the cell phone, just as there's reasonable suspicion that a body cavity search would turn up something, the idea that the phone is more intrusive than the body cavity search, and therefore requires a warrant, just seems sort of ridiculous. Well, it's not that the problem is body cavity searches. I mean, specifically for contraband. Which is at the core of the justification. I don't really understand that about the contraband. So, you know, I mean, haven't you already rejected that? So, like, in United States v. Irving, we said, of the warrant exception context in which the Supreme Court has addressed the issue of pretextual searches, border searches, the most analogous to searches of vessels by customs officials. And in that context, the court noted, we would see little logic in sanctioning such examinations of ordinary unsuspect vessels, but forbidding them in the case of suspected smugglers. Similarly, in the case of searches at airports, it would make little sense to allow random searches of any incoming passenger without reasonable suspicion, but require reasonable suspicion for searches of passengers that are suspected of criminal activity. For this we reason that the validity of a border search does not depend on whether it is prompted by a criminal investigative motive. So it seems like you've already adopted a rule. Yeah, it's kind of like periscopes. If you have the authority to do the search, the fact that you're really doing it because you are looking for evidence of some other crime that's not exactly the thing that justifies the exception in the first place does not invalidate the authority to search, right? You've said that already. I mean, maybe it's right, maybe it's wrong, but it's our case law. The court has already done that, though, with respect to ordinary searches. And I'd just like to close the rhyme with distinguishing ordinary searches. Searches of other effects other than criminal. Right? Yeah, but you said that even in the context of searches that require reasonable suspicion, right? Because in Levy, we say if you reasonably suspect that there's a crime, that Border Patrol reasonably suspects that there's a crime going on, it shouldn't be blind to that, right? Even if it's not something that's normally within the remit of Customs and Border Protection. Maybe, again, I just can't, because I don't know how right it is to completely change the equation. One side of the equation, a half a crop about the intrusion, with respect to cell phones. And so it is a different category, that modern cell phones as a category implicate crime and conservation. Far beyond those implicated by the search of things like a cigarette pack, a wallet, or a purse. And also a diary. But no circuit has, even the Ninth Circuit in Canoe, right? Has, while limiting what counts as a digital contraband, whatever they were meaning by that, even there doesn't require a warrant. So you're putting us out, you would have to go even further out in terms of the level of protection that a phone gets than Canoe, right? I am, but I have a fallback to Canoe. So, I am saying that even child pornography and contraband should not be a justification for a warranted search. For the reason stated in Command 5, which is that it doesn't prevent anything from coming to the country. But the system doesn't even, I don't believe it even references leaving in that section where it's talking about. It's hard to be dealing with border searches post-Riley without even discussing leaving. So I'm not sure how much value that analysis has. Well, let's think of it. There are three different kinds of border searches. And Riley's trajectory has three different kinds of searches. Searches with cell phones are a completely different category than searches with other personal effects. Leaving is more like the notebook game. But it's the notebook game. It's more like the diary game in English and Riley. Riley, the papers show that cell phone searches demand a much higher justification. In other words, they have to be more tightly justified by the reason for the border search. No, no, no. Riley doesn't talk at all about the border search. No, no. But the reason for the border search. They're talking about the search with two arrests. It's the other half of the equation. The justification. But there are different justifications in a search incident to arrest than there are at the border. Right? The border has always been a unique place where the government's interest is at its knees. Right? According to the case law. So how did that, you know, incident to arrest is a pretty common thing that happens. Right? Arrest, search, incident to arrest. Whereas the border is in a different sphere. Literally. Well, the reasons that have been given by the Supreme Court to justify the border search, in terms of the personal effects and the traffickers coming in, are to protect the territory, the United States territory and its heritage, preventing the unwanted entry of persons and effects, to intercept contraband and prevent smuggling, and to control who and what may enter the border. It's not just to fish around for general crime. It's to control who and what may enter the border. Like, there are some people who enter the border because we don't want people engaging in criminal activity to enter the border. Right? We have a pretty elaborate set of laws about grounds for inadmissibility. Right? Why somebody should not be able to cross the border. Some of those grounds involve, you know, advocating terrorism or belonging to a totalitarian political party or other things. And you might find evidence on a cell phone that they're engaged in that kind of conduct and therefore are inadmissible. So the idea that, you know, I understand it's kind of reasonable for the Supreme Court to say it's unlikely that there's going to be something on the cell phone that implicates officer safety, you know, in a search incident to arrest. But if the reason why we don't require warrants at the border is because somebody might be inadmissible and the government is entitled to control the entry of unwanted persons into the country, it seems totally to cover the cell phone. But that was not his case. Because Michelle's equation was that all the permanent residents were the same, right, returning as anybody else was. He wondered if it was excludable because they were so likely to respond. You know, but I just read to you the passage that if the government has the authority to do these routine searches that include the cell phones, the fact that they have a criminal investigative motive for a particular search doesn't invalidate that authority. Right? No, I was quoting from Irving because that's the routine searches. And then, you know, we've also decided this case, Taba, right, where there were those American citizens that had attended a conference about Islam in Canada and the Customs and Border Protection detained them for four to six hours, questioned them about their activities, fingerprinted them, photographed them, kicked their legs apart so they could do a pat-down search, searched their vehicles before letting them back into the country, all without individualized suspicion. And we said that that's part of a routine border search. You're telling me that if you had done a manual search of their cell phone, that would have been less intrusive than the six-hour detention? No, but they only had suspicions of terrorism. Well, they had general suspicions of terrorism, but there was no reasonable suspicion that any one of those people was involved in terrorist activity, right? Your Honor, I'm sorry I'm not familiar with that case, but that kind of intrusion, it is bad and probably very intrusive as a case of a cell phone search, but differently so. What Rodney's talking about is that a cell phone search is really unnecessary for an intrusion. It's unnecessary for protecting officer safety in the context of a search incident to arrest. And for preserving evidence, which is a much broader justification. Okay, but if the justification for the warrant exception at the border is not about officer safety or preserving evidence, it's about the sovereign's authority, what is it? It's about the sovereign's authority. The sovereign's, the right, the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this country. Right, and that is to prevent persons who should not be impeded or persons who should not be impeded. And there was no such reason for this search here. There was no claim in our laws that they didn't have to be impeded. It was a valid category. It was an LPR. It was entitled to enter the country even if they found evidence. So let me just, so just generally. So like let's say, you know, there was, they were just doing regular checks to make sure that somebody wasn't admissible. So they were checking his phone for evidence of advocacy of terrorism or something. It's a kind of regular screen. That would be allowed? No, it wouldn't be allowed. Okay, so then you're saying it actually doesn't matter that they were looking for a particular crime. You're just saying you shouldn't allow authorities at the border to check phones. We shouldn't allow authorities at the border without a warrant, without a warrant to scroll your phone to look for evidence. But you just said the whole idea is that the sovereign has the right to keep people who are unwanted from entering the border and there are grounds of inadmissibility where the evidence on the phone would be relevant, right? Well, I'm not sure that there are grounds of inadmissibility for someone in an LPR or for like a citizen returning. Well, a citizen maybe, a citizen maybe can be regarded as admissible, but an LPR could be, right? I think they have the same rights at the border, but returning LPRs, I have to base on that, I think. Well, regardless, I mean, if in fact you can have routine searches because you're policing unwanted persons coming into the border, if there is a generally applicable rule that you can look at property in order to see if there's grounds of inadmissibility or contraband and so on, you're saying there should be an exception for people who are, have a different immigration status? Okay, so it's a general exception to the warrant requirement, right? That wasn't... So if you just said that it's okay for people who don't have that immigration status, it means that the purpose of the exception covers this kind of search. I'm not sure how it applies to people who don't have that status. I do know that they couldn't have... My way of thinking about what I meant to say was that if they found evidence of crime and it was found, which they were looking for and found, they couldn't have just stopped them from entering. It wasn't an argument. It was about a provocation that they had going, about trying to be committing a crime. And even under crime, I'm trying to... Right, so then your argument is even if they're able to do searches at the border, because here they were investigating a particular crime, they shouldn't be allowed to take advantage of that authority. So you're saying there's an exception to the warrant exception that should apply when they really have a motive of investigating a particular crime. Right, but that is exactly contrary to what we said in Irving, which was that the validity of a border search does not depend on whether it's prompted by a criminal investigative motive. So generally, the search falls within the exception. We do not say that because the investigative authorities have a particular motive of investigating a particular crime, that invalidates the search. Well, that's what you said in the context of a non-cell phone search, and my argument depends on this court accepting... Actually, just the way you articulated the argument did not depend on it being a cell phone. You just said, look, they're looking for evidence of a particular crime. Like, you didn't say anything about how the cell phone makes things different. My interpretation? Yeah, just the way you articulated it now. So why is it that your argument, even though you're phrasing it in general terms about the motive of the investigators, that really it's just about cell phones? It is just about cell phones. My argument is about cell phones, because it's based on violence change of one side of the equation, which is that cell phone search is so intrusive that it must be very specific... Okay, so in this case, if the U.S. authorities had gotten the same tip from the British authorities that Al Sidwe was engaging in identity fraud and so on, and they stopped him at the airport, and he had a briefcase full of lots of documents, they could rifle through all those documents to see whether there's identity fraud going on, right? That would be good to me. That would be good to them. Okay, so they can rifle through, they can take out his briefcase, a journal, a notebook, whatever, and they can rifle through all of that, but if he keeps the same information on a cell phone, they need to stop and get a warrant. Exactly. But why? Why does that make any sense? Because the search of, as Riley knows, a cell phone is a repository for his entire life, and for the government to crack open and start looking through a cell phone is an enormous intrusion. It's much bigger than taking someone's diary, sorry, diary of a person. And for one reason, it's practical. It's bigger? Really? I mean, if somebody keeps a diary about their daily activities and all of their private thoughts and so on, you think it would be less intrusive to read their diary than to scroll through their text messages or whatever? I think part of perhaps what you're saying is aside from issues of motive, it's just whether or not a cell phone search should be considered routine, because that's also I guess a factor in deciding how the border exception applies. And so beyond what the motive is for the search, should this type of cell phone search post Riley be considered routine? Well, that's one issue. The government, for example, Susan Cooney did not hold a cell phone as a non-routine search. So she didn't even hold it as a routine. She held it as a non-routine, and she provided a leading result in non-routine search. The government is arguing, the government is arguing that no, it's just routine, and anybody's cell phone should be looked at. That's really just, that's extraordinary. I mean, you're saying it's extraordinary, but it's the position of the First Circuit, the Fourth Circuit, the Fifth Circuit, the Seventh Circuit, the Eighth Circuit, the Ninth Circuit, and the Eleventh Circuit, right? Well, it's not the position of the Ninth Circuit. Well, the Ninth Circuit does say that a manual search of a cell phone is routine. It just says there it might depend on the motive or what you're looking for. But as a general matter, a manual search of a cell phone is a routine search in all of these circuits. In fact, is there any circuit that says a manual search of a cell phone is a non-routine search? I think the Fourth Circuit might say that. But it doesn't matter whether it's called routine or non-routine. The question is whether it can be done without a warrant. Can it be done without a warrant? Is there any circuit that says that it needs a warrant? Well, Conrad does. No, it doesn't. It does not. It says, wait, it says, can you guys take from the manual search for anything other than contraband? It's not just a... No, no, no, but let's take digital contraband, right? For digital contraband, the Ninth Circuit says you could do a manual search with reasonable suspicion. But you can't go beyond that and look for evidence of where it came from or any other evidence of the cell. All the other evidence that they wrote to the cell looking for further evidence of the cell phonography event was correct. And that was even in the manual search. But it doesn't say it needs a warrant. It says that that would be non-routine. You need a reasonable suspicion, right? I mean, there's no circuit that says you need a warrant. No, Conrad does say you need a warrant except for if you have a reasonable suspicion of contraband on a cell phone. That's the only exception to the warrant requirement. Okay, but you're just telling me that there's no such thing as contraband on a cell phone, right? But you acknowledge that all the other circuits think that there is, right? Look, we don't have a child pornography case, so we don't have to get into that. But if child pornography is contraband because it's stuff that we don't want coming into the country, why aren't all of the stolen social security numbers that are stored on his phone contraband? That's not contraband, that's evidence. Child pornography is also evidence, but it's also contraband. The drugs are contraband, but they're also evidence, right? They cut the numbers and wrote them down for later investigation. They didn't see the numbers. If contraband is something you stop when you enter into the country, it's good. Like, for example, if he was carrying a false passport in his pocket, that might be even as contraband because that is the thing itself. This is just evidence of the crime. Okay. We're going to hear from the anarchist, Mr. Wilkins. Good morning, Your Honors, and may it please the Court. I want to return to my theory here because I think that the discussion so far has touched upon, for example, body-cabbing services. The discussion has touched upon the movement of other circuits. I think the fundamental issue here is that Riley instructs that when you are conducting an analysis under the Fourth Amendment, an analysis that's a requirement, and any exception to the Fourth Requirement, you have to treat cell phones fundamentally differently, and they are intrusive in a different way than a body-cabbing service. Of course, no one wants to be subjected to that. You have to treat them differently, but you have to just understand what they are, right? Absolutely. So the analysis in Riley is that it's just the nature of cell phones that it probably isn't a threat to officer safety, right? No, Your Honor. Let me clarify what I mean here. So if you're thinking about the balance of justice, and this is what Riley wanted to say, let's just stick, first, with the privacy intrusion and how that differs from a body-cabbing search. Before we move on, let's do the government. If we talk about the intrusiveness here, of course, a body-cabbing search is not a pleasant experience, I'm sure, but it's looking for specific things in the mind, like drugs, etc. It is not exposing any expressive content. When we talk about what Riley talked about... I'm sorry, but we said that the distinction between a routine and a non-routine search is about searches of property versus searches of the body, and we do think that exposing a person's genitals is a greater intrusion on privacy and dignity than a search of property. So you're telling me that that's not true, that what we said about that is not right, that, in fact, the search of a cell phone is more intrusive than searching somebody's genitals? Well, the court's never... This court has never addressed that question. We have addressed that question. You're just saying that those cases are abrogated by Riley. No, Your Honor. I don't think this court has ever heard an electronic device search and the intrusiveness of it, the privacy interest on it, particularly under the First Amendment, and the expressive interest has never been compared to a lie detector. Okay, so you're talking about expressive interest now. I mean, a cell phone isn't necessarily... So, you know, I just talked about this Taba case, right? That's the case where we did confront a First Amendment interest because the border authorities were targeting people who had attended a religious conference in Canada, and we actually said in that case that that was a substantial burden on their First Amendment rights. We just thought it was justified by the authority to police the border. But there, you have people who go to a particular religious conference. They're detained for six hours. They're subject to questioning about their activities, pad frisks, kicking their legs apart to open up their legs to do the frisk, and then thorough searches of their vehicles during that six-hour detention. You're telling me that that is less intrusive than looking at somebody's cell phone and implicates expressive conduct less? Well, you know, I do think it's different, and I think, again... It is different. I mean, it seems to me I'd rather somebody scroll through my cell phone than do that to me. So that's how I think it's different. So I'm asking why I should think the cell phone is more serious. No, Riley... So Riley, when you first emphasized, it's a unanimous decision of the Supreme Court. And every justice acknowledged that you cannot apply analog era constitutional principles in the context of this new technology. And that was 2014. We're now 11 years later. Cell phones have gotten even more, a lot more storage. The quality and quantity, is that a unanimous decision? I mean, you're going to have to decide if it's a unanimity of Riley, but it is also the unanimous position of all of the circuit courts that you do not need a warrant to do a cell phone search at the border, right? Actually, Your Honor, I think if you look at cases like Toussaint on the 11th Circuit, you look at Levy... Sorry, Levy on the 7th Circuit, Toussaint on the 11th Circuit, Sheehan on the 8th Circuit, these cases do not take Riley seriously. They simply say... They may be kind of sensitive to one, but they just think the border is different. They don't actually engage in the analysis that Riley requires. And I think... I mean, I think Toussaint actually does go pretty in-depth into it. They say, Riley is about the logic of a search incident to arrest exception, but in the context of the border, we and all the other circuits... You know, so the 11th Circuit has done this, but the 2nd Circuit has done it too, have said a routine search is about searches of property. Swincourt has... You know, maybe it's not said that so directly, but has indicated that. That the distinction is between property and searches of the person. And the cell phone is property, and there's no reason why Riley abrogates all of those cases. Right? Your Honor, I think your description just now of the... Indicates exactly what I was talking about earlier, which is the failure to analyze the privacy intrusiveness of a part of the knowledge test. What your Honor described was immediately going to become an interest, that it's a different border exception, but I think if you... If courts are faithful to... The Supreme Court went out of its way, spent paragraph after paragraph talking about the intrusiveness of a cell phone search, and indeed said that the government... That a search of a cell phone... And by the way, Riley has followed manual searches only. In fact, one of the phones was a flip phone, very different from the phones that we have now. And the court said, in those manual searches, that a government search of that kind of phone would expose more to government than in someone's home. And so I think that the government's position... Yeah, one point that's made in Two Cents, and also in the Fifth Circuit case on this, is that actually they said that you can have a search of a home pursuant to the border exception. I guess in our circuit, we don't have homes at the border, so maybe we haven't confronted that question. But are you saying that those cases are wrong? Well, I think those cases are wrong. They don't actually... Let me say it for a moment as an example. The First Circuit case... Okay, so maybe you think all the circuits are wrong, but do you agree with what Ms. Cassidy said, which is that if they were doing a search, Mr. Al Stiglay had a briefcase and they rifled through all of his documents, or he had a personal diary and they read it, that that would be fine, that the cell phone would be different? I think the cell phone is fundamentally different, Your Honor. I think that... To me, you're talking about the First Amendment in that context, because you're saying if there is a journalist and they take out his reporter's notebook, or there's a photojournalist and they look at the film on his camera, you're saying, well, that's just property. But a phone implicates expressive interest in a unique way. But of course, the average search of a cell phone is not going to be about expressive interest. It's going to be about this kind of thing, that there might be criminal evidence of a crime on the phone. So isn't your rule just kind of dramatically, it's over-inclusive because it includes all of these permissible searches of cell phones that don't implicate expressive activity. It's under-inclusive because if they even target a reporter's notebook or something that clearly is about expressive activity, you're saying that that is fine and you wouldn't need a warrant for it. Well, Your Honor, so I'll address both sides of that first. I think whether it's every, or the vast majority of searches of cell phones do involve expressive content. And if you look at, for example, these photonic decisions by Chris Morrison, she explains why there's no distinction between sort of a manual and a graphic. And that, of course, some of these searches take hours. The agents can look at as much on the phone as they want. They're not just scrolling through and stopping at one photo or the other. They're literally rummaging through a phone. That's the importance of this finding is enormous. And we have to remember... I'm sorry, that doesn't answer the question of the difference if I jot down my notes in a note function on the phone versus if I come, you know, I still like using Moleskins, right? So I jot down a lot in Moleskins. What's the difference? Yes, Your Honor. So the documents in the briefcase, the Moleskin diaries, certainly implicate expressive material. But I think... So that, you know, in that sense, the quality of the expressive material, which Stueckler talks about, is similar. But in Ryder's report emphasizes two things. The quality, which I think here is even different from what would be in a Moleskin or a briefcase, is the different types of information on the phone. And the court lists them out in great detail. But then there's the issue of quantity. So, for example, if I come through with a digital camera, I don't use a phone, I use a digital camera, how would you distinguish that? So if I'm at the border, I don't even have a phone, but I have a digital camera, is that different? Can they scroll through the digital camera? What if I come through with an old microcassette recorder and don't have a phone where I would have recorded notes, is that different? Is it the fact that the phone aggregates all these other functions that makes it so unique at the border? Go ahead. Your Honor, those certainly raise concerns, but I think, again, and I know we've said the word rally about a million times, but if you look at the, you know, there are sentences with 20 different examples just to give of all of the kinds of things that are on a phone. There really is not another device like a phone or a laptop or a tablet, and that's what we're talking about here. And I just want to spend one second, the Al-Assad case out of the First Circuit, the court there rejected the war program, but if you look at that case, the court relied entirely and largely on a pre-riots case where the court said in that earlier case that it was about a laptop, and it said basically the laptop didn't make any difference in physical options. And that is an argument that the court expressly rejected. That would have been an argument in Riley. And it doesn't. And the court said, you know, that that was like comparing, I think it was like a ride on a horseback to a journey to the moon. Those were the court's words. And so, you know, it really is extraordinary what the court said in Riley, and I think it is... I think there's two ways to think about whether Riley affected it. So you could say, well, we've previously said that the key distinction is between searches of property or searches of the person, and since Riley is in a different context, we don't have to reconsider that. Okay. But you're saying, well, you should take account of what the Supreme Court says about how cell phones are somewhat different, right? So if we do a kind of qualitative difference, right, so we say, okay, we've generally said searches of property are routine and searches of the person are non-routine, but let's take account of the nature of the cell phone. Maybe it's a different kind of property that doesn't implicate the reasons for the border exception, right? So if the way I think about that, as I've suggested, is it's true that the nature of the cell phone is it doesn't implicate the interest at stake in the search incident to arrest exception because it doesn't implicate officer safety, but it could indicate that the person is somebody who shouldn't be entering the country or they could be carrying material that shouldn't enter the country. It seems to me it does fall within the nature of the border exception. So if I've taken account of the idea that I should look closely at the nature of cell phones, why isn't that correct? I want to come to that next, which is the government interest side of balancing here. I do think that the interests here are narrower than your line of positive, which is that it's unwanted. The word the court uses is unwanted persons or things, and certainly when it comes to things, there the court is talking about contraband. That's not really an issue here. But why is it an issue here? So if the guy has a bunch of files that he's using to do identity fraud, to create fraudulent passports, why isn't that the same thing as a bunch of documents that would be identity fraudulent? I think the difference is this. When you talk about this, the courts that are trying to think about contraband in this context, including I think Levy, that the only thing that's been identified so far as odd within that is a digital image or a video of child pornography because that is the thing itself. That is the crime. That is the unlawful object. But it might not be in the phone. It might be on the cloud, and it's just you see it on the phone because that's the way to access the cloud. But looking on the phone indicates that this is a person who has that material, and I guess there's a copy of it on the phone perhaps, but that's why you want to be able to search for it. So if this guy has a bunch of fraudulent identity documents or stolen identity documents, why isn't that a similar thing? Well, first, I believe that the government policy requires that Wi-Fi be turned off when the phone is searched at the border, so I don't think it's the case that that image somehow is present on the phone. But the idea that social security numbers themselves in a document on a phone, that may be evidence of a crime, but it's not the crime itself. The possession of an image or video of child pornography is the crime itself, and that's why the courts have said this is the only thing that's been identified so far. They haven't thought of anything else. But can I interrupt you there? This notion of digital contraband, that really is just a Canoe principle. Are there other cases that limit to that extent? Just because, for example, in the Fourth Circuit, the Ida Paton case, just because they say that it has to have, let's say, a nexus to national security or collecting duties, that doesn't mean there could be evidence that is not in and of itself contraband that goes to the issue of a national security nexus. So it doesn't have to be contraband what is being looked at on the phone. Well, it's interesting. There are some circuits that have used broader language like that. However, I believe every circuit that has addressed the question actually has been addressing something that's evolving in the notion of contraband. I don't think the Eleventh Circuit, right? I mean, I think that's probably, I think it's probably fair to say that that's the broadest, no reasonable suspicion for anything at the board. Sorry. I mean, what I meant to say was the articulation of, even if the articulation of government interests are quite broad, but the court actually, the actual alleged crime there, in these cases, fall within the narrower definition of the exception of the purposes of the Ninth Circuit gave in comment. So even though you have broader language in some of these cases, what they actually looked at would fall within a narrower definition of the purposes of foreign search. And let me also just emphasize that, I mean, we're talking about millions of people entering this country. I don't know how many come into JFK a day, but all of these people face an enormous chilling effect on their expressive abilities because they know there's a risk that their cell phone will be charged. So if, in fact, we had a case where, let's say there's a journalist passing through an airport and some border official got wind of that happening and doesn't like that person and so decides to rifle through all of his things and maybe takes his reporter's notebook and reads it and makes fun of him or whatever, and it's clear that he's the target of the search because of expressive activity, you'd be in here saying that that is a violation of the First Amendment, right? Because of targeting expressive activity, right? Yes, sir. So why isn't that the solution to the First Amendment question? That if there is targeting of expressive activity, that makes the search invalid, and that's the way normally the First Amendment works. But the idea that in most applications, a cell phone search is not targeting expressive activity but only might incidentally get it doesn't mean that we do a kind of facial blanket border bar. Well, Your Honor, I mean, I think that the burden on expressiveness applies across the board, and that's why in looking at this question of border search exception, you know, and you're looking at sort of the type of search, which is, you know, the electronic device search, and whether that as a large category falls within the border search exception and not the government's position. And what we're saying is that burden on expressive activity of every single trial or every journalist is enormous and cannot possibly be outweighed by the weak connection to the government interest at stake. Okay, can I speak? You know, you were talking about the government interest narrowly in terms of contraband, but you acknowledge that the way the Supreme Court has articulated it, it's about persons or property. And we do have a large list of grounds of inadmissibility of a person to come into the country, and some of that might be evidence that's on the phone, like advocacy for terrorism or membership in an authoritarian political party or so on. You might see propaganda on the phone that shows inadmissibility. So why wouldn't that be relevant for somebody just doing routine searches at the border? Well, you know, non-citizens are not an issue in this case. That very well may be. Well, he is not a citizen. Well, sir, he's a lawful, a legal, an LPR. So I think that that takes him well within the constitutional protections that were applied to a citizen. I mean, Your Honor, it's such a... I mean, can't he be denied citizenship if he does something that may render him inadmissible or deportable? Well, I mean, Your Honor, I think if he has the required documentation to show that he's a legal permanent resident, he should be entitled to enter, just like a U.S. citizen who shows a passport. It's not as though... I mean, even for a U.S. citizen, you could say, well, who... All right. I mean, I'm not sure that that's right, but I'm just talking about the logic of the border exception. So, like, let's say that it's somebody that we would agree may be inadmissible. It's going to be part of the routine practice of border authorities to determine whether the person is inadmissible, right? And that might implicate whether they have terrorist propaganda on their phone or something like that. Well, you know, I guess I'm trying to figure out sort of the circumstances in which that might arise. Because, you know, we're talking here and the government is talking here about literally being able to search without suspicion the cell phone of anybody who crosses the border. That's an incredibly broad and invasive power. And so the... Yeah, but you acknowledge that it's broad and invasive, right? Because it's not like everybody is bringing contraband in, and yet you don't dispute that the government has the authority, without a warrant and without reasonable suspicion, to open up the luggage of anybody coming into the country and just rifle through everything and look through everything, right? Or a vehicle crossing the border. The government can stop the vehicle, do a thorough search of it. It's a good point. It's even said you can dismantle the vehicle and look inside and so on, right? That, you know, I think you'd agree, seems intrusive. And yet that falls within the border exception. So the idea is not that this is intrusive. The idea would have to be this is something that's qualitatively different from all that. And that's what we... And your argument for why it's different is because, well, there could be contraband hidden in the fuel tank of the vehicle, but there can't be on the phone? No, no, no. I'm sorry. Not at all, Your Honor. The distinction, the court, you know, was well aware of the search of a camper van, whatever it might be, at the border. The distinction here is literally the vast volume of information on hand, and this is crucial to the expressive interest, the quality of the information. And it's not just the privacy interest of the person who happens to have the phone with them. It's all the people they interact with who don't think that the government's going to go right through all their communications with their friends, their family, et cetera. The privacy burdens are truly extraordinary, and I think that the government is very quick to just minimize that and say the border's different. But the Supreme Court has always required in every single exception of the warrant requirement that the question of, you know, when a category, when a type of item is argued to fall under the exception, there's this critical balancing test, and the government interests have to be carefully looked at. And does it matter? Like, so, for example, in Judge Menasseh's example, rifling through the suitcase, if in a pocket of that suitcase, the customs agent found eight cell phones. There was the one on his person and eight other cell phones in that. So all of a sudden, those nine phones would come under this when it's obvious that most people don't walk around with nine cell phones. So how would that – I know maybe it's a far-fetched hypothetical, but we're trying to come up with a rule, right? What would that say? Thank you, everyone. I – this may be my response here, but we might have to wait and answer it. But I think that, you know, in that situation, they may very well be able to get a warrant. And I think – No, I'm not – I'm not – we're – the question is not whether they can get a  If they had a warrant, it wouldn't be an issue, right? But you wouldn't be raising the issue. I'm just saying an agent at the border comes upon eight phones in your suitcase. Is that a different situation than just someone coming through with their one cell phone? It very well may be, Your Honor, but I think the key point is that example, it just cannot possibly justify the uncluttered search of the phone of every single person crossing the border. No, but I'm just asking you about that one person. I'm just saying, like, that may – in that situation, that could potentially justify looking at those – So you're saying that the phone in and of itself isn't what's sacrosanct? Because those are eight phones. Why are they qualitatively any different than the one that was maybe in his breast pocket? Well, and this goes to the warrant – the warrant point, Your Honor. I guess what I'm saying is that the question is whether those eight phones give rise to the types of concerns that, when explained to a neutral arbiter, would justify obtaining a warrant. But you're assuming that there's a need for a warrant. I'm saying, from the border search perspective, isn't that a different situation, but nevertheless involves phones? I mean, the fact that there are eight phones does not – I don't think that would justify unnecessarily rightfully proving what's on them. If the notion is that there are eight phones, I'm not sure what kind of crime or suspicions that officers of the agent might have, but I don't think – you know, they could be entirely legitimate. So, you know, I think that, you know, one thing I want to emphasize in this court case with Riley is that imposing a warrant requirement isn't really asking all that much because getting one can become so much more efficient, it can be gotten rather quickly. And so it's not asking that much. Right, but that – you just talked about the millions of people coming through across the border. In Riley, you have one individual being arrested. You can call the magistrate judge and try to get a warrant, right? But now you've got your million people coming through JFK. Are they all just waiting for the phone call for the warrant? I mean, they're not – for various reasons, they can't all be stopped. The government doesn't have that kind of manpower. But I think more importantly here – and I think – I forget which one of you made the point that, you know, arrests happen all the time. So the fact – if that can be done in the context of a search instance arrest, it can certainly be done in the case of a person, you know, crossing the border. And also, you know, and I should say, I mean, to strengthen our evidence brief, we know a lot of evidence from FOIA requests and otherwise of, you know, keeping people for hours, asking them incredibly intrusive questions based on what is found on their phone. And so if you're going to keep someone for hours, 15 minutes to get a warrant isn't really adding that much time to either the traveler or to the agent who's doing the search. And, you know, the super did another second point, which is that, of course, if another exception to the warrant requirement applies, that can be used, like the exigent circumstances exception. So imposing a warrant requirement here, number one, it doesn't – it's not really that of a burden on the government. And number two, if there are cases where, you know, there are exigent circumstances, they can't wait for the hour or 15 minutes or whatever it is, they may be able to use that exception. And it's – you know, so I – Okay. I think we have that argument. We'll hear from you again for a minute. But let's turn to the government. Mr. Lightenberg. May I speak before I – I'm Jim Lightenberg. I'm an assistant United States attorney in the Southern District of New York. I represent the United States in this appeal. Even after Riley's report, the appeal has uniformly held that an annual search of an electronic device with a warrant does not require any visual identification. No circuit has ever required – Have all the circuits, though, addressed that specific question? Because isn't the Fourth Circuit the – referred, I guess, to forensic searches requiring some type of individualized suspicion? But they didn't specifically rule on, I don't think, what manual searches do or do not require? That's correct. There is a split in the circuit as to whether a more invasive forensic search requires reasonable suspicion. But on the question of whether a brief manual search like the one conducted here requires reasonable suspicion, every circuit that has considered the question, which is five circuits, have all come out the same way. They all said no individualized suspicion is required. Certainly no circuit has said a warrant is required. And neither the Supreme Court nor this Court has ever found that a search of a property as opposed to a search of the body is a non-routine search. Well, those circuits that say the manual search is routine and you don't need reasonable suspicion, but if it's not about contraband, you would need reasonable suspicion. I guess they have kind of said that a search of property requires reasonable suspicion, right? So the Ninth Circuit has limited the scope of the border search exception to contraband. That is not the law of the circuit. Let me – I'll come back to it in a moment. But as to this precise question, in Hano, the Court said, and I quote, Manual searches of self-own captive order are reasonable without individualized suspicion. So as to that question, whether a manual search requires individualized suspicion, the courts are uniform, it does not. Now let's talk about Levy because that's been talked about a lot. Levy is completely preclusive of that contraband rule for me. In Levy, the government admitted that this was a pretextual search, that that A254 of the appendix in Levy was pointed out to the court in Appellant 3 that this was a pretextual search and it was for securities fraud. It had nothing to do with contraband. Levy was post-Riley. In Appellant 3, Riley was cited to the circuit. The circuit well knew about Riley. And the circuit said, not only is there no problem with this sort of pretextual search, with this sort of coordination between different agencies, it says it's commendable. That's exactly what they should be doing. So there it was very far afield from what Hano says is the core of the border search authority. It was for securities fraud. And in Levy, is it a routine search or is it one where they have reasonable suspicion because they thought that there was a crime going on? So this is page 17 of the Ripple Library claims. Abroadly, that Levy and Irving, in both of those cases, this court determined those to be non-routine searches. That is not true. What the court said in both cases was here there was obviously reasonable suspicion, so we don't have to decide whether this is routine or not routine. But what the court went on to say in Levy, I think notably, post-Riley, was, and this is in footnote three, like the Supreme Court, we have suggested that the label non-routine should generally be reserved for intrusive searches of the person, such as by-cabin searches or strip searches, not belonging, and do so explain why there's good reason for that conclusion. A search of the body, like as Judge Menachia, as you know, in U.S.C., this is a search of inside a woman's genitals. This is wildly more invasive than a brief manual search of someone's cell phone, and that's the type of search that has been labeled non-routine. That's a search where you're making physical contact with someone. I share your intuition that going into my genitals would be more invasive than looking at my cell phone, but opposing counsel suggests otherwise. So did the Supreme Court in Riley say that actually cell phones are, you know, a window into the soul or something that makes it more invasive than reaching into somebody's genitals? No. Riley didn't say anything about comparing. Right, although, I mean, certainly the comparison of a strip search to a search of someone's cell phone, I mean, they're very different types of searches, and so it's not a question of is a search of a cell phone as violative or intrusive as a strip search. It's frankly just a very different category. The question is is it intrusive to a level that the Supreme Court has recognized that we shouldn't treat it like going through somebody's purse or going through someone's wallet or going through someone's luggage. And I think that's more the question is that hasn't the court recognized, you know, it didn't compare it to strip searches, but it did say this is an extraordinarily deep, essentially deep dive into someone's privacy, and so that still matters. Is it the most egregious type of violation? Does it compare to a strip search? Perhaps not, but that doesn't answer the question of whether or not we should label it routine or otherwise give it special consideration, does it? Riley certainly said that a search of someone's cell phone is invasive, and we don't deny that, but the question here is whether, under the poor search exception, it falls under the presidential routine or not routine. Every circuit who has considered that question has found for a brief manual search like the one conducted here that it falls into the bucket of routine. So certainly if we adhere to the idea that a search of property is routine and a search of a person is non-routine, obviously a phone is not a person, it's property, so it would fall into the routine category. But does Riley require us to at least think about whether a cell phone is a special kind of property that might be treated differently? Certainly Riley said that the court should consider, obviously, a search of a cell phone to be something that is intrusive, but it goes far beyond having any sort of conclusion here because, as multiple members of the court have pointed out, the rationale for the search instance in this forensic section is very narrow. It's strange to me that the court held to protect the lease and to prevent the charge of theft. As the court recognized in Levy and in other cases, it's not important. Right, but don't we, I mean, that comparison to what motivates the search incident to arrest, it's like you're just considering half of the balance. You're considering the government interest in a search incident to arrest. The court is saying, well, it doesn't fully apply with a cell phone because it's not a weapon. You can see it's a cell phone. There's not that fear of destruction of evidence. That's government motivation rationale for the search, and the court compared that to, in exchange for that, there's this thing that you can look into and find out way more than is relevant to the case. There can always be evidence of a crime found, and so looking at the border exception, yes, we're talking about security and keeping out contraband, what have you, but then you still have to balance that with the nature of the intrusion, and so it's not just a question of can intrusion still serve government purposes. We balance those purposes against the level of intrusions, right? You absolutely do. So one side of the equation is that the scope and rationale for the border search exception is much broader, but, again, on the other side, you also balance that against evasion of privacy, and the Supreme Court in this court has held over and over again that there is a reduced expectation of privacy at the border, that the border is different than the interior, and that's why extremely invasive searches like the one conducted in Java, as Joshimanachi noted, where the people were attending a conference, were held for four to six hours, detained, fingerprinted, photographed, forcibly had their lights separated. That was a routine search. That's not something that you would normally be subject to in the interior. During a routine search of your baggage, an agent could look through your underwear, read your diary, look at medication that could reveal you have a mental health issue or HIV, look at your birth control. There's all kinds of invasive things that can happen at the border, and let me say one thing about routine non-resistance. Routine is a bit of a misnomer, as the court explained in Java. The question is not how ordinary it is. Plenty of things like a four to six-hour detention of people because they attended a conference is not something that ordinarily happens when you go to the border. The question, as explained in Java, is not how ordinary or commonplace the search is, but rather the level of intrusion into a person's privacy. And when you look at the two categories that historically have existed, which is things like searching a woman's genitals versus searching property, a brief manual search falls much more into the category of searches like a person's diary and their medication and their underwear than it does into a search. You're saying a brief manual search. I mean, does the brevity of the search matter? The court doesn't have to decide where sort of the outer limit is. You know, there's been suggestions that an agent could effectively turn a manual search into a forensic search by spending, you know, 24 hours looking at the phone. That's not what happens here. Here the record shows that the search was at least under 50 minutes, probably much shorter. And so the court, for these purposes, only has to decide, as every other service has considered this question. I guess if we don't think there's something special about the phone, you know, we could say on top of that a tension of six hours would be routine. And the Supreme Court said in the case about the person smuggling drugs that a 12-hour detention of a person might not be routine. And so, you know, I guess that gives us some guidance about the length of a kind of detention. Yeah, Tom, I can give you some of that analysis. I think in Montoya, which was where— Montoya. Yeah, Montoya, where I think it was about a 16-hour detention. So it was overnight. They kept the person overnight. They kept the person overnight and said, basically, we're going to wait until you have a vial movement. And by the way, you can't use the toilet. You have to use a garbage basket because we're going to observe that. That was found to be a non-routine search. It does seem like that should require reasonable suspicion, right? And that is what the Supreme Court found. So this is nothing like that until these sort of brief manual searches conducted here should, like the brief manual searches conducted in the case considered by all the other circuits, should not be what I think in the first position. What about the idea that, you know, yeah, you can rifle through somebody's diary and hold their belongings in the luggage and so on, but if you're just kind of browsing a phone, you've got their messages and their photographs and all sorts of information about them, and you're going to come across a lot more personal information than any kind of physical property. Is that true? It may be the case that a search of a cell phone is, you know, somewhat more intrusive than a search of a diary. But certainly in terms of the two categories where you have, you know, searches of diaries and prescriptions and underwear on one side and you've got extremely invasive bodily searches where there's physical contact on the other. You think that a search of a diary is just somewhat more intrusive than a search of a cell phone? Is that what you said? I think that I acknowledge that a search of a cell phone may be somewhat more intrusive than a search of a diary. Just somewhat, just somewhat more intrusive, searching someone's cell phone that has potentially access to their bank records, what they've searched on the Internet, all their friends, their text messages, what news sites they look at, that's just somewhat more intrusive than searching someone's diary. Then searching the combination of someone's diary, prescription medication, underwear, their actual, if they have a real estate, their bank records, their social security number, all kinds of very sensitive things that are being used. I mean, if I checked a diary that included my camera pad, my innermost thoughts about what I'm thinking about, everything that's going on in my life every day, and I get to read that, that does seem more intrusive than whatever you could get from a manual search of a cell phone, like the text messages that say, let's have lunch tomorrow or whatever. It's probably hard to imagine something more intrusive for somebody else to read than a diary. Are there further questions? Can I just ask one final question? So your view in terms of what's required for a manual search is that it's not no probable cause, no reasonable suspicion, no individualized suspicion at all. Is that your position? Yes, that's our position. It's what every circuit does if there's a question. And that's just your position with regard to, and I know that's all at issue in this case, is manual searches. Yes, this Court may not reach the question of forensic searches. That question is before the Court in another case, the U.S. B2B case, which is 24-16-80, but it did not come before here. I'm sorry, the question about a forensic search is before us in another case? Correct. But that case is still being reviewed. Okay, so I get it. So I guess your position would be that the interest is not limited to contraband or digital contraband, but if we thought that that was a meaningful concept, does this case involve digital contraband? Yes. The stolen Social Security numbers of other people stored on the phone is absolutely digital contraband. And the searcher also had a clear nexus before. And why is it digital contraband? I mean, you know, opposing counsel keeps pointing out that they didn't seize the numbers. It's just evidence of him stealing the Social Security numbers. It's not like an actual piece of material that's being stuck into the country. But they may well have had the right to seize it. But the fact that they didn't, you know, make this lesson, you know, typically makes it more intrusive. And yet stealing someone's Social Security numbers and keeping them on your phone is totally contraband. It's like stealing a DVD. That's contraband because an individual is not allowed to have that in his or her possession. And so it is something that you could seize, like delete from the phone or whatever if you detect it at the border. It is stolen goods, which is exactly what the DVD is. And is the interest at the border, is it just about preventing contraband from entering the country? No, Your Honor. And the court, how otherwise, indeed. The big argument that the Border Search Authority is limited to contraband was before the court indeed. A post-trial case, that exact argument was presented to the court, and the court rejected it. The court said, no, there's a much broader interest in the border search. And the court held there that- Well, Levy kind of says, you know, regardless of what the origin of the border search exception is, border agents shouldn't be blind to other criminal activities they see as going on, right? So I guess I'm asking, what's the original justification for having the border search exception? Is it about preventing contraband from entering the country, or is it something broader than that? It's something more than that. It's about preventing crime at international borders. And CBP and border agents absolutely have a strong interest in doing that. And that's why the court- And does the crime have to be something about border crossing? No, Your Honor. Indeed, the crime was security-described. It didn't have anything to do with border crossing. The appellant argued it should be limited to contraband, and that you shouldn't be able to use these sort of pretexts. The appellant said that you rise to this parade of horribles, and the court rejected it. The court said, actually, collaboration is to be commended, not condemned. It said, we note that DEA and FBI agents frequently assist customs officials in the execution of border searches. And this court, in the face of this exact- By far, the reason for that cooperation is because, for whatever reason, there is an exception to the warrant requirement at the border. And so if the government thinks that there's a criminal coming in, they can take advantage of the authority they have at the border to do the search. I guess I'm asking, why did we originally have that exception? Is it just because of contraband? I mean, the way the Supreme Court has articulated it is prevent people or goods from entering this country. So maybe it is about people, particular kinds of people we don't want entering this country. It is absolutely about that, too. It is about preventing people from entering this country. It is about preventing unlawful goods. It goes way beyond contraband. It goes in the interest of who is here, what they're doing here. Right, so you have all of these laws about grounds of admissibility. A lot of that depends on whether you've committed a prior crime or whether you engage in terrorism or belong to a violent political party and things like that. Does that mean that the border officials are able to search for evidence of that kind of admissibility? Yes, Your Honor. So that would be First Amendment protected generally, right? I mean, if you advocate for terrorism, generally that is First Amendment protected speech, but it is also a ground of admissibility. So it does mean that the First Amendment, unless that's an unconstitutional law, the First Amendment applies in a different way at the border than it does generally, right? Yes, that's exactly right, Your Honor. Actually, in Al-Assad, the First Circuit explained why imposing some sort of higher restriction on expressive material is totally unworkable. It would protect terrorist communications, which are inherently expressive. It would create a totally unworkable standard where government agents on their feet are supposed to decide, well, is this expressive material, is this non-expressive material? And it would contravene the Supreme Court precedent about government action. So it's a different scrutiny. Now, it came up in the colloquy with the opposing counsel that maybe the rules are different for citizens and non-citizens. Is that a distinction that might be like maybe citizens have the full panoply of First Amendment protection but non-citizens do not when you're talking about border searches? Is that a viable approach? It's not something I've looked into closely, and I don't think the court has decided here. I think what's notable there is that Al-Assad was not just suspected in using a fraudulent password with a U.S. non-immigrant visa. He had a pending citizenship application. So, of course, CBP has a strong interest in this case in knowing whether this person who they're currently deciding who the citizens should serve in the patrolling society or admitted as a citizen into the country is engaging in criminal activity. Right, because that could be a ground of denying citizenship.  And other grounds of admissibility might also be a ground of denying citizenship in other cases. Yes. So how would you deal with the argument that Mr. Wilkins makes about the expressive, you know, the burden on expressive activity that might be implicated if you can search homes at the border? So if there are specific cases, you know, where a journalist is targeted or somebody is targeted for this reason, there are other mechanisms to deal with that. There are business actions. There are appeals to Congress. There are, frankly, those types of lawsuits that were filed in Al-Assad and in Saba. Those types of lawsuits exist. I'll take those up in a moment. So the concerns about journalists being targeted, they're just not presented here. And frankly, the First Amendment argument presented by the media is not before the court. It was not presented below. It was not briefed below. And an advocate can't present an argument that hasn't been briefed by the media. So that's just not before the court. Okay. Thank you, Mr. Lightenberg. We'll turn to Ms. Cassidy on the proposal. Thank you, Mr. Lightenberg. I'm going to turn to you today. Just to point you to the last point. It's also really not the legal task force that was perceived by the UK. It was perceived somewhere by the UK authorities, and it was only reached out to them through federal recognition. So that's just something I'm going to keep that. And then, as that's an essential key point to come from, is CONEL. CONEL clearly holds that except for a brief of an initial search for digital contraband, the OTP, that was covered, a warrant is required for a manual search. At page 1090, they say, first, order officials are limited to searching for contraband only. They may not search in a manner untested to search contraband. So, that's what CONEL says. The validity of the manual search is after its inception with the OTP, when it was used for contraband. However, a second search, a manual search, was conducted. And you didn't want to search through a phone, say, gauging consistent with a search for contraband. You know, if they're recording phone numbers, battling, or texting messages, et cetera. They have no connection to digital contraband. To the extent... Yeah, so I think we acknowledge that the 9th Circuit has this rule that it has to be limited to contraband. Right. It does say that they're the only what? They require a warrant, that's what. They said there has to be a warrant to search a phone.  So that, I just want you to clarify that. And then... Okay. Levy, again, did not address telephone search. You know when you're in a search site, right? That means that you didn't involve telephone search. And why do you all have telephone? But Riley does say... I'm sorry. Levy does say for the proposition that there isn't a limitation to the kinds of crimes that are routinely investigated at the border. Right. Okay. Okay. All right. You're going to make one final point. And I cite a second part of your case in the 667 frame tonight that I've shown that looks regarded. But those discoveries are more likely to be to you and far reaching. Today, by contrast, it is no exaggeration to say that many of the more than 90% of American adults on the telephone keep on their purse a digital record of nearly every aspect of their lives, from the mundane to the intimate, allowing them to please to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or two in the occasional case. Okay, I think we have that argument. Thank you very much, Ms. Hanson. We'll hear from Mr. Wilkins for a minute as well. Thank you, Your Honor. I'll keep this quite brief. So the last argument that Counselor Gilman made was that somehow the First Amendment is not a court of court. That is not correct. We argue in the amicus brief that the First Amendment is relevant in two respects. There's an independent First Amendment claim, and that was not argued before the district court, and so that may well be in front of this court. However, it is relevant to the Fourth Amendment analysis, and rightly so talks extensively about the expressive interest at stake. So the notion that this court can't take the First Amendment interest of trial lawyers and journalists into account in this case is just simply incorrect. Secondly— I think that part of the reason why the argument is that the search of a cell phone is more intrusive is because of the expressive quality of the cell phone, but that becomes the Fourth Amendment argument, and the sort of First Amendment values kind of inform how we should think about it. As we point out in our brief, the district court's words kind of repeatedly assume scrupulous exactitude has to be applied when looking at the Fourth Amendment when there is expressive material at stake. Secondly, just briefly on Levy, number one, as it said, is not involved with cell phones. It doesn't matter that Rodney decided to bike in one of the briefs. There was no reason to, really. But secondly, and I think your Honor mentioned this, Judge Minocci, that in that case, the defendant was returning to the country to face criminal charges. And so I think, as Judge Giroir has pointed out in the Fox case, which we said in our brief, that Levy on those facts cannot possibly stand the proposition that you can search a cell phone for anything whenever a trial lawyer crosses the border. The last point I want to make, and I'm returning to Riley, which is that in Riley, you have a manual phone search intended to arrest. Of course that's going to be a brief search. So the idea, the company was talking about a brief search. That was what was at issue in Riley. The court never said, oh, we don't think there's going to be much of an invasion of privacy happening when the person's next to their car and they're being arrested. The intrusiveness is extraordinary, whether you characterize it as brief or not, and certainly border agents don't adhere to any sort of— Well, whether you characterize it as brief or not, but what if, in fact, it is brief? What if they look at the phone for three minutes just to see if there's anything obvious that you could see immediately on the phone that indicates criminal activity, and they don't see anything, and they let the person go on their way? Do you still think that that is more intrusive than a body cavity search? I don't know where to draw the line, Your Honor. I think that, you know— So there is some category of brief manual searches that will not be very intrusive, right? Well, I think that, you know, if you're going to say 30 seconds, a minute, I don't know where to draw the line, but as I said before, and I think as Judge Lee pointed out, the nature of the search is fundamentally different because of the material that is at issue, which is the expressive material. Okay, I think we have that argument. Thank you very much, Mr. Wilkin. The case is submitted.